Filed 12/5/22  In re Audrey L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Audrey L., a Person Coming Under the Juvenile Court Law. | B318489 |
| | (Los Angeles County Super. Ct. No. 19CCJP05482A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Elizabeth M., et al. Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Ashley Price, Juvenile Court Referee.  Conditionally affirmed with directions.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Elizabeth M.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant Marcos L.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel for Plaintiff and Respondent.

**INTRODUCTION**

Elizabeth M. and Marcos L. appeal from the juvenile court's orders under Welfare and Institutions Code section 366.26[1] terminating their parental rights to their daughter Audrey L. They argue that the court erred in ruling the parental-benefit exception to adoption under section 366.26, subdivision (c)(1)(B)(i), did not apply and that the Los Angeles County Department of Children and Family Services and the court failed to fulfill their duty of inquiry under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. We conclude that the juvenile court did not err in ruling the parental-benefit exception did not apply, but that the court failed to ensure the Department complied with the inquiry provisions of ICWA and related California law. Therefore, we conditionally affirm the juvenile court's orders terminating Elizabeth's and Marcos's parental rights and direct the court to ensure the Department conducts a proper and thorough inquiry into Audrey's possible Indian ancestry.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Juvenile Court Detains Audrey, Asserts Jurisdiction, and Removes Audrey from Elizabeth and Marcos*

One day in July 2019, when Audrey was eight months old, Elizabeth sent a text message to her mother stating she "'wanted to crash along with the baby,'" meaning Audrey. Elizabeth's mother contacted the police and told Elizabeth to go home with Audrey. After Elizabeth returned home, a police officer interviewed her and provided her with mental health resources.

A few days later, a Department social worker interviewed Elizabeth, who told the social worker that, for a few days, "she felt like crying uncontrollably" and that she "called an agency to get help." Elizabeth said she "was feeling better now" and never wanted to hurt Audrey. A few weeks later, Elizabeth tested positive for marijuana; she also overdosed on alprazolam in an attempt to kill herself. Elizabeth told the social worker that she took the pills because Marcos recently tried to force her car door open while she was parked in her driveway. Elizabeth also recounted a recent incident where Marcos burned her finger with nitrous oxide. Elizabeth stated that she and Marcos had a history of domestic violence and that she had obtained a protective order against him.

Marcos told the social worker that, the night before Elizabeth overdosed on alprazolam, she went to his house, asked to see his phone, and when he refused, called the police. According to Marcos, Elizabeth sent text messages to Marcos that said: "'I just don't care anymore,'" "'I'm just going to take some pills,'" "'I [will] have my homies jump you,'" and "'I just took all the pills, whatever happens, I love you.'" Marcos denied using any drugs or burning Elizabeth's finger with nitrous oxide;

3

Marcos stated he saw a tank of nitrous oxide and bottles of beer in Elizabeth's car. Marcos admitted he had a criminal history, including an arrest for violating the protective order that prohibited him from having contact with Elizabeth.

The Department filed a petition under section 300, subdivision (b)(1), alleging Elizabeth's mental and emotional illness, suicidal ideation, attempted suicide, and history of substance abuse rendered her incapable of providing Audrey with regular care and supervision and created a substantial risk Audrey would suffer serious physical harm. The Department also alleged that Marcos failed to protect Audrey from Elizabeth's substance abuse and that Marcos's history of substance abuse rendered him incapable of providing Audrey with regular care and supervision and created a substantial risk Audrey would suffer serious physical harm.[2] The juvenile court detained Audrey; ordered Elizabeth and Marcos to participate in parenting classes, individual counseling, and drug testing; and ordered the Department to provide Elizabeth and Marcos with separate, monitored visits three times a week for three hours each visit.

In a report prepared for the combined jurisdiction and disposition hearing, the Department stated Audrey was growing and developing appropriately in the home of Josefina C., her paternal great aunt. Josefina reported that Elizabeth visited or called approximately once a week and that, before Marcos was incarcerated, he visited three times a week.

Elizabeth and Marcos pleaded no contest to the allegations in the petition. The court sustained the petition as amended, declared Audrey a dependent child of the court, and removed her

---

[2]  The Department subsequently amended the petition to add a count under section 300, subdivision (b)(1), based on the history of domestic violence between Elizabeth and Marcos.

4

from Elizabeth and Marcos. The court ordered Elizabeth and Marcos to complete a domestic violence program, parenting classes, individual counseling, and random, on-demand drug testing. The court ordered monitored visits for a minimum of two times a week for two hours each visit.

B.    *Elizabeth and Marcos Fail To Reunify with Audrey, and the Court Terminates Their Parental Rights*

In a report prepared for the six-month review hearing under section 366.21, subdivision (e), the Department stated Audrey appeared happy and was developing appropriately in Josefina's home. Elizabeth visited Audrey weekly, and Marcos visited "sporadically." Josefina reported that Elizabeth "was very hands on with Audrey" and that "Audrey was always very happy to see [Elizabeth]." After Marcos was released from jail, he visited Audrey weekly, and Audrey "appeared to be more bonded" with Marcos and often cried when he left.

For the 12-month review hearing under section 366.21, subdivision (f), the Department observed in its report that Audrey remained bonded with Josefina and Josefina's other children. Josefina reported that, during some of Elizabeth's virtual visits with Audrey, if a male voice came on the call, Elizabeth abruptly disconnected the call and stated her "'phone died.'" When Marcos had virtual visits with Audrey, Audrey sometimes pointed to the screen and said, "'Liz! Liz!'" (Marcos's relatives called Elizabeth "Liz.")

The Department's report for the 18-month review hearing under section 366.22 reflected that, during this review period, Elizabeth visited "consistently" twice a week. Josefina told the social worker that, during a virtual visit, Elizabeth was taking a bubble bath and "'it seemed like someone was in the bathroom

5

with her" because Elizabeth "'kept looking to the side as though someone else was in there.'"

A status report six months later stated that Elizabeth had been in a car accident and that, for approximately one month after the accident, she visited "semi-regularly." Josefina reported Elizabeth often did not call Audrey for a virtual visit at the agreed-upon time and instead called late in the evening, after Audrey had fallen asleep. The social worker reported an incident in September 2021 where Elizabeth and Marcos forced their way into the home of Audrey's paternal grandmother; Elizabeth was under the influence and acted "erratically" before the police were called to escort her away.

At each of the review hearings, the court found returning Audrey to Elizabeth or Marcos would create a substantial risk of detriment and maintained Audrey's placement with Josefina. After the last review hearing, the court terminated reunification services for Elizabeth and Marcos and set the matter for a selection and implementation hearing under section 366.26.

The Department's report for the hearing under section 366.26 summarized Elizabeth's "sporadic and inconsistent" visitation with Audrey. The Department reported that, after one visit in October 2021, when Elizabeth dropped off Audrey at Josefina's house, Elizabeth "was confrontational" and that, when Josefina tried to close the door, Elizabeth put her foot in the door to prevent the door from closing and accused Josefina "of being the reason [Audrey] was taken from her." The social worker stated this confrontation occurred in front of Audrey. The report indicated Elizabeth at times followed the schedule for her monitored visits with Audrey, but at times she did not. Shortly before the selection and implementation hearing, Elizabeth cancelled two visits in one week. The social worker concluded that, although Audrey was "usually happy" to see Elizabeth,

6

there did not appear to be a "significant bond" between them and that Audrey had a "healthy, positive attachment" to Josefina, looked to her for attention, and called her "'mom.'"

The Department's report also summarized Marcos's sporadic and inconsistent visitation with Audrey. During his visits he mostly took pictures of Audrey and left the feeding and changing to Josefina. The social worker concluded that Marcos did not have significant contact or visitation with Audrey and that, as a result, Audrey did not have a significant bond with him.

On February 8, 2022, after denying a petition Elizabeth had filed under section 388, the juvenile court proceeded to the hearing under section 366.26 to select and implement a permanent plan for Audrey. Elizabeth testified that she visited Audrey "as much as" she could, but that the schedule "always change[d]," which made it difficult for her to visit consistently. Elizabeth stated that, for the past six months, she visited every weekend for approximately nine hours over two days and that she called for a virtual visit three times a week. Elizabeth accused Josefina and the social worker of creating "barriers" to visitation by "removing" her hours. Elizabeth described the "fun" activities she and Audrey did together, such as doing arts and crafts and going on outings to the park or beach. When asked by her attorney if she ever acted in a "parental role," Elizabeth said that Audrey "always" felt safe with her and that she "constantly" talked to Audrey about her feelings. Elizabeth stated that, at the beginning of every visit, Audrey runs to her and says, "Mommy, mommy, mommy." According to Elizabeth, Audrey was "very attached" to her. Elizabeth described one visit where Audrey was "very happy" to see her because she had not seen her for two or three weeks; at the end of the visit, Elizabeth said, Audrey cried "really bad" and "threw up all over herself."

Marcos described the activities he did with Audrey, including teaching her how to dance, color, and drink out of "big girl" cups. Marcos said he went to all of Audrey's medical appointments before he went to jail "over false accusations."

Josefina testified she monitored the virtual visits between Elizabeth and Audrey. Josefina said that Elizabeth appeared intoxicated during her calls with Audrey "on more than one occasion" and that Elizabeth missed some of her scheduled in-person visits. Josefina explained Audrey cried after some of the visits because she was tired from "a lot of activities" she did with Elizabeth. Josefina stated Audrey calls her "mom" and calls Elizabeth "Elizabeth." According to Josefina, when Elizabeth fails to call at the designated time, "every so often" Audrey asks Josefina, "Mom, where is Elizabeth? Can I talk to Elizabeth?" Josefina testified she stopped monitoring Elizabeth's visits after Elizabeth dropped Audrey off one day and "was being extremely aggressive" with Josefina. Josefina said Marcos did not attend all of his scheduled in-person visits with Audrey and did not always stay for the entire length of the visit. Josefina stated neither parent attended any of Audrey's medical appointments in the two and a half years Audrey lived with her or inquired about Audrey's eye or skin condition.

The court stated it would consider the elements a parent must prove to establish the parental-benefit exception applies under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*): (1) whether Elizabeth and Marcos regularly visited Audrey, (2) whether Audrey had a substantial, positive, emotional attachment to her parents such that she would benefit from an ongoing relationship with them, and (3) whether terminating that relationship would be detrimental to Audrey when weighed against what the court called "the sense of belonging that a new family would confer" on her. The court found Elizabeth and

Marcos did not have regular or consistent contact with Audrey and did not engage in "meaningful parental activities." The court cited the statements in the Department's reports that Elizabeth's in-person visits were "sporadic and inconsistent" and that she often missed "the [virtual] calls as well." The court observed Elizabeth had very recently cancelled two visits in one week.

Turning to the second element of the parental-benefit exception, the court cited a "pattern" of "inappropriate conduct" that was "detrimental" and "very concerning to the court." The court referred to an incident where Elizabeth and Marcos were both under the influence and forced their way into the paternal grandmother's home and another incident where, after a visit with Audrey, Elizabeth placed her foot in Josefina's doorway, which made Josefina feel "threatened." The court pointed to evidence Elizabeth and her boyfriend threatened Marcos, which suggested they knew where Josefina and her relatives lived.[3] The court found that Marcos's visits "primarily" consisted of him taking photographs of Audrey, that he did not feed or change her but instead asked Josefina to watch her while he went outside to smoke a cigarette, and that he sometimes ended the visits early when his friends arrived. The court found that, for both parents, "There hasn't been regular and consistent quality visitation."

For the third element of the parental-benefit exception, the court concluded the physical and emotional benefit Audrey would

---

[3] Marcos testified that, the day before the hearing, Elizabeth and her boyfriend called and threatened him. Marcos stated Elizabeth had threatened him in the past, including one incident where she said: "Just you watch. You're a little bitch. I know where your mom lives. I know where your grandma lives. I know where your aunt lives."

9

receive through permanency and adoption outweighed any benefit from her relationship with Elizabeth or Marcos. The court observed that Audrey, now three and a half years old, had been living with Josefina "for an extended period of time." The court ruled no exception to adoption applied, terminated Elizabeth's and Marcos's parental rights, and designated Josefina as the prospective adoptive parent. Elizabeth and Marcos timely appealed.

## DISCUSSION

### A. *The Juvenile Court Did Not Err in Ruling the Parental-benefit Exception Did Not Apply*

#### 1. *Applicable Law and Standard of Review*

The parental-benefit exception applies in "'exceptional circumstances'" where the evidence shows the child has such a strong emotional attachment to the parent that terminating parental rights "would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i); *In re D.P.* (2022) 76 Cal.App.5th 153, 163.) This exception permits the court to choose an option at the selection and implementation hearing "'other than the norm, which remains adoption.'" (*Caden C.*, at p. 631; see *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068; *In re J.D.* (2021) 70 Cal.App.5th 833, 852.) To prove the exception applies, the parent must show, by a preponderance of the evidence, "regular visitation and contact with the child, taking into account the extent of visitation permitted"; "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and "that terminating that attachment would be detrimental to the

10

child even when balanced against the countervailing benefit of a new adoptive home." (*Caden C.*, at p. 636; see *In re Eli B.*, at pp. 1067-1068; *In re J.D.*, at p. 854.) The parent has the burden to establish this exception. (*Caden C.*, at p. 635; *In re A.G.* (2020) 58 Cal.App.5th 973, 996.)

"A substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639; see *In re D.P.*, *supra*, 76 Cal.App.5th at p. 165; *In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1068.) "The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations," which "are properly reviewed for substantial evidence." (*Caden C.*, at p. 640; see *In re D.P.*, at p. 165; *In re Eli B.*, at p. 1068.) The "ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at p. 640; see *In re D.P.*, at p. 165; *In re Eli B.*, at p. 1068.)

2. *Substantial Evidence Supported the Juvenile Court's Finding Elizabeth Did Not Visit Audrey Consistently*

The first element a parent must prove to establish the parental-benefit exception, regular visitation and contact, "is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151 [""'[s]poradic visitation is insufficient'""].) Substantial evidence supported the juvenile court's finding Elizabeth did not visit consistently with Audrey twice a week, the level of visitation and contact permitted by the

court.[4] While Elizabeth visited "consistently" twice a week for a few months before the 18-month review hearing, the Department's reports for all the other review periods stated Elizabeth did not visit consistently or did not do so twice a week. When Elizabeth could not visit in person because of her car accident, she often missed appointments for virtual calls. As the court pointed out, Elizabeth cancelled two in-person visits with Audrey as recently as a week and a half before the selection and implementation hearing. The evidence amply supported the court's finding that, over the course of the dependency case, Elizabeth did not maintain consistent and regular contact with Audrey. (See *In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1070 [substantial evidence supported the juvenile court's finding the father "did not meet his burden to prove that he 'maintained regular visitation and contact'" where the father's visitation with his children "was sporadic and also entailed significant gaps"]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [substantial evidence supported the juvenile court's finding the parents failed to establish they regularly visited their children where there were "significant lapses in visits"].)

Elizabeth and Marcos argue that, while Elizabeth's record of visitation "may not have been perfect," her visitation and contact with Audrey "was substantial" and "sufficient to continue or develop an emotional, positive attachment." But that is not the standard; rather, as discussed, the standard is whether Elizabeth visited consistently to the extent permitted by the court orders. She did not. True, Elizabeth testified otherwise, but the

---

4       Neither Marcos nor Elizabeth challenges the juvenile court's ruling the parental-benefit exception did not apply to Marcos.

12

juvenile court did not credit her testimony, and we do not revisit that credibility finding.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 640 ["a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts'"]; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317-318 [juvenile court's factual determinations "should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence'"].)

Citing *Caden C.*, *supra*, 11 Cal.5th at page 632, Elizabeth and Marcos argue that the purpose of regular visitation and contact "is 'not to punish parents or reward them for good behavior in visiting or maintaining contact'" and that "'the focus is on the best interests of the child.'"  They ignore, however, the evidence the lapses in visits did not benefit Audrey, and in fact may have had adversely affected her.  (See *In re Eli B.*, *supra*, 73 Cal.Ap.5th at p. 1070 ["the visitation element is to be understood in light of the overall purpose of the beneficial relationship exception"].)  When Elizabeth failed to call Audrey at the designated time Audrey had come to expect as part of her routine, Audrey asked Josefina where Elizabeth was and when she could talk to Elizabeth, which indicated Audrey was concerned and disappointed.  (See *In re Eli B.*, at p. 1071 [father's "failure to take regular advantage of his visitation rights adversely impacted his son," where the child expressed increased anger, worry, and disappointment about the father's inconsistent visitation].)

3.     *Substantial Evidence Supported the Juvenile Court's Finding Audrey Did Not Have a Substantial, Positive, Emotional Attachment to Elizabeth*

In determining whether a parent has proved the second element of the parental-benefit exception, "courts assess whether 'the child would benefit from continuing the relationship'" by considering "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 317; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; see *Katherine J.*, at p. 317; *In re A.L.*, at p. 1151.)

In finding Audrey did not have a "substantial, positive, emotional attachment" to Elizabeth, the juvenile court considered Elizabeth's "detrimental conduct," including Elizabeth's aggressive behavior toward Josefina, which occurred in front of Audrey. Such behavior, along with evidence Elizabeth appeared intoxicated during some of the virtual visits, intermittently looked aside while taking a bath during one of the virtual visits, and abruptly ended some of the virtual visits when a male voice was heard in the background, supported the court's finding Elizabeth failed to demonstrate she had consistent, quality visits. (See *Caden C.*, *supra*, 11 Cal.5th at p. 637 ["A parent's struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child."]; *In re Katherine J.*, *supra*, 75 Cal.App.5th at pp. 321-322 [although the father and his daughter had "maintained a warm and loving

14

relationship," his violent conduct during one visit "diminished any benefits she derived from a continuing relationship with him"].) The court also properly considered that Audrey had spent almost all of her life in the care of Josefina, to whom she had a strong, healthy attachment, and that Elizabeth did not appear concerned with eye and skin conditions Audrey had that required special attention. (See *Caden C.*, at p. 632.)

Elizabeth and Marcos point to Elizabeth's testimony that, at the end of visits, Audrey sometimes cried, resisted leaving, and made statements like "I don't want to go" and "I want to be with you, mom." Josefina, however, testified Audrey called her "mom," which the social worker corroborated in the report for the section 366.26 hearing, and the evidence suggested Audrey called Elizabeth "Elizabeth" or "Liz." As discussed, we do not revisit conflicts in the evidence the juvenile court resolved. (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.) At most, the record showed Audrey delighted in going out and playing with Elizabeth, which is not enough to meet the standard for establishing the second element of the parental-benefit exception. (See *In re G.H.* (2022) 84 Cal.App.5th 15, 25 ["Friendly or affectionate visits are not enough."]; *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [parental-benefit exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent"].)

B.      *The Juvenile Court Erred in Failing To Ensure the Department Complied with ICWA and California Law*

1.      *Applicable Law*

"ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq. (2022)) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes."[5]  (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 316; see *In re J.C.* (2022) 77 Cal.App.5th 70, 77; *In re Y.W.* (2021) 70 Cal.App.5th 542, 551.)  "The minimum standards established by ICWA include the requirement of notice to Indian tribes in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights 'where the court knows or has reason to know that an Indian child is involved.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8; see 25 U.S.C. § 1912(a); *In re H.V.* (2022) 75 Cal.App.5th 433, 436; *In re T.G.* (2020) 58 Cal.App.5th 275, 287-288.)  ICWA's notice requirements "facilitate a determination of whether the child is an Indian child under ICWA" and ensure an Indian tribe "is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*Isaiah W.*, at p. 8; see *In re Antonio R.* (2022) 76 Cal.App.5th 421, 429.)

---

[5]      "'For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.'" (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 317, fn. 5; see 25 U.S.C. § 1903(4); § 224.1, subd. (a).)

16

"To ensure Indian tribes may exercise their rights in dependency proceedings as guaranteed by ICWA and related state law, investigation of a family member's belief a child may have Indian ancestry must be undertaken and notice provided to the appropriate tribes." (*In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 316; see *In re J.S.* (2021) 62 Cal.App.5th 678, 688.)  Federal regulations implementing ICWA require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.  [Citation.]  The court must also instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77, internal quotation marks omitted; see *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402-403.)

In addition, section 224.2, subdivision (a), imposes on courts and child protective agencies "'an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child.'" (See *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 316; *In re Y.W.*, *supra*, 70 Cal.App.5th at p. 551.)  Section 224.2, subdivision (b), requires the child protective agency to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."[6]  (See *Rylei S.*, at p. 316; *Y.W.*, at

---

[6]      "'[E]xtended family member' shall be defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen

pp. 551-552; Cal. Rules of Court, rule 5.481(a)(1).) And section 224.2, subdivision (e), "imposes a duty of further inquiry regarding the possible Indian status of the child '[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine there is reason to know that the child is an Indian child.'" (*Rylei S.*, at pp. 316-317; see § 224.2, subd. (e); *Y.W.*, at p. 552; Cal. Rules of Court, rule 5.481(a)(4).)

"'The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families.'" (*In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 317; see *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 430.) If the inquiry required under section 224.2, subdivisions (b) and (e), "'"'results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.'"'" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78; see *In re Josiah T.*, *supra*, 71 Cal.App.5th at pp. 404-405.) "'"'The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'" [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not

---

and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c) [the term "'extended family member'" shall be defined "as provided in Section 1903 of the federal Indian Child Welfare Act"].)

18

apply to the proceedings, subject to reversal based on sufficiency of the evidence.""" (*J.C.*, at p. 78; see § 224.2, subd. (i)(2); see *Josiah T.*, at p. 408 ["the court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child protective agency] inquiry that is not proper, adequate, or demonstrative of due diligence"]; Cal. Rules of Court, rule 5.481(b)(3).)

2. *The Department Did Not Comply with Its Duty of Inquiry Under ICWA and California Law*

Elizabeth and Marcos contend, the Department does not contest, and we agree the Department failed to comply with ICWA and section 224.2, subdivision (b). On each of their ICWA-020 forms, Elizabeth and Marcos checked the box next to the statement, "I have no Indian ancestry as far as I know." The detention report stated: "The Indian Child Welfare Act does not apply. On 7/23/2019, mother Elizabeth . . . denied the child has any Indian Ancestry, and completed [a Department questionnaire] reflecting such." The report for the combined jurisdiction and disposition hearing stated ICWA "does not apply" and cited Elizabeth's and Marcos's statements denying Audrey had any known Indian ancestry. It appears the Department relied exclusively on Elizabeth's and Marcos's representations (as far as they knew) to conclude ICWA did not apply. The Department did not interview any extended family members, including Audrey's maternal grandmother, paternal grandmother, and paternal aunt, even though the social worker spoke to each of these family members in the course of her investigation into the allegations in the petition.

Nor does the record reflect the juvenile court ensured the Department complied with its statutory duty to conduct a full inquiry of Audrey's possible Indian ancestry (or made any

19

inquiries of its own). At the detention hearing, the court stated: "Both parents indicate no American Indian ancestry. Therefore, the court has no reason to know that this child is an Indian child under the Indian Child Welfare Act." At the combined jurisdiction and disposition hearing, the court acknowledged the paternal grandmother's and the paternal aunt's presence, but did not ask them about Audrey's possible Indian ancestry. Like the Department, the court erroneously relied solely on Elizabeth's and Marcos's denials of known Indian ancestry to conclude ICWA did not apply. (See *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 318 ["Regardless of a parent's response concerning his or her possible Indian ancestry on the ICWA-020 Parental Notification of Indian Status form or when questioned by the court at the initial appearance, if . . . a child has been detained and placed in temporary custody of a child protective agency, section 224.2, subdivision (b), requires the agency to ask the child, the parents, extended family members and others who have an interest in the child whether the child is, or may be, an Indian child."]; *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 431 ["section 224.2 required the Department to inquire of [the child's] extended family members regarding his possible Indian ancestry, and it was error for the Department to fail to do so"].)

The Department, recognizing we have held such errors are not harmless, asks us to "conditionally affirm the order terminating parental rights and remand the matter for compliance under the ICWA and related California law." Agreed. The extended relatives the Department skipped over in its initial inquiry likely had information that would bear meaningfully on the court's determination whether Audrey is an Indian child. (See *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 435 ["In most circumstances, the information in the possession of extended relatives is likely to be meaningful in determining whether the

20

child is an Indian child—regardless of whether the information ultimately shows the child is or is not an Indian child."].) Without a proper inquiry by the court or the Department to address the lack of information about Audrey's possible Indian ancestry, Elizabeth and Marcos do not have to make a showing of prejudice. (See *In re H.V.*, *supra*, 75 Cal.App.5th at p. 438 & fn. 4 [where the record "demonstrates that the Department failed to discharge its first-step inquiry duty, we conclude that [the] mother's claim of ICWA error was prejudicial and reversible" because the Department's failure "is responsible for the absence of information in the record about the child's possible Indian ancestry"]; but see *In re Dezi C.* (2022) 79 Cal.App.5th 769, 774 ["An agency's failure to discharge its statutory duty of initial inquiry is harmless unless the record contains information suggesting a reason to believe that the children at issue may be 'Indian child[ren],' in which case further inquiry may lead to a different ICWA finding by the juvenile court."], review granted Sept. 21, 2022, S275578.)

## DISPOSITION

The juvenile court's orders terminating Elizabeth's and Marcos's parental rights to Audrey are conditionally affirmed. The juvenile court is directed to ensure the Department complies fully with the inquiry and, if necessary, notice provisions under ICWA and related California law.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.